We'll hear argument next in Case 11-798, American Trucking Associations v. City of Los Angeles. Mr. Lerman. Mr. Chief Justice, and may it please the Court. This case is about the plain text of the F-Quad A's express preemption clause and the continuing vitality of this Court's decision in Castle v. Hayes Freight Lines. I'd like to start by showing why the Port's requirements here fall within the text of the statute and cannot be saved by any market participant exception. The F-Quad A provides that no State or political subdivision of a State may enact or enforce any law, regulation, or other provision having the force and effect of law related to rates, routes, and services of a motor carrier. The only statutory language at issue here is the force and effect of law requirement. And the Port's actions have the force and effect of law under any reasonable interpretation of the phrase. The Port is imposing binding standards of conduct on motor carriers as a condition of accessing a channel of interstate commerce. The Port is enforcing those requirements through criminal penalties. I thought that the Port said we don't apply our criminal penalties, which come from the tariff, we don't apply those to licensed motor carriers. They made that representation. So I think we have to accept that as being so. They did make that representation and we could accept that, but it's irrelevant because the Port is still imposing the criminal penalties on the terminal operators. And when a State is imposing criminal penalties, that is classic governmental action, the State acting in its sovereign capacity regardless of whom the penalties are imposed upon. And in this Court's decision in Roe, it made clear that States can regulate trucking activity through penalties, in that case civil penalties, imposed only on people who do business with truckers. Here, the State's requirements are coming at the truckers from both ends. On the one end, you have the criminal penalties imposed on the terminal operators to coerce their conduct and exclude truckers. On the other hand, you have the tariff, which puts conditions on access to the Port of Los Angeles, which is a key channel of interstate commerce. So the Port's requirements here have the force and effect of law in spades. Can I break down your arguments into two components, if you might? Whether or not the market participant exception exists at all, and if it does how far does it go? So let's get to the first question in my mind. It seems almost impossible for me to believe that the State couldn't require someone to put a little placard like you get at the almost any building that you go into to park your car. They ask you to put a little placard in the front of your window, so they know who you are and where you're going in the port, okay? Why is the placard requirement here any different than that requirement generally? If you enter property, you have to, most people tell you, put a placard in the window to tell us you got permission to come in. It's different in this case, Your Honor, because in addition to the overlay, that 14-506 specifically targets identification requirements and for purposes of this case it's, but I understand. But even if that, if we didn't have a market participant, why couldn't the State say, when you come into the terminal, you just got to put a little placard in, so we know that you're not parking here overnight when you've already been unloaded or something else? I think you need to look to the particulars of this case, and the fact is that the placard requirement here is codified into an ordinance, it's backed by criminal penalties, and it's restricting access to a channel of commerce. Because we have all those factors here, it has the force and effect of law. The, the. Sotomayor's Court, could the terminal say, we have a pollution problem and only modern trucks can come and unload here? No. So they have to take trucks that are too heavy for this crane to lift? Heavy is a different scenario, Justice Sotomayor, because there's an express exception to the FQUA for weight and size restrictions. So Congress carved out a series of exceptions for the FQUA for safety requirements, which gets to part of your question, for height and weight and size limits, for requirements pertaining to the transport of nonconsensual goods and the like. It did not create a proprietary exception. So a lot of Your Honor's concerns may well be covered by one of these other exceptions. But there is no exception for a proprietary action. If it has the force and effect of law and it does not fall within one of the enumerated exceptions to the statute, then it is preempted under the terms that Congress used. Scalia. Even though, even though a related statute did, did make an exception for proprietary action, isn't that right? The FAA? The ADA. Yes. Yes, that's quite right. And precisely because that statute contained an exception, and this Court has recognized that when Congress enacted the FQUA, it copied the ADA, and it copied the express preemption clause, but Congress chose not to include that proprietary exception. Ginsburg. Do we know why, why the Congress had a different regulation for port and for airfield? I don't believe the record shows, the legislative history doesn't show why it might. But Congress thought, clearly copied the statute and made the decision not to include it. So by the terms of the statute, Congress wrote a statute that preempts any action with the force and effect of law, and it chose not to carve out an exception for proprietary action, which, as you say, Your Honor, was included in the Airline Deregulation Act. So that just lends added force to the argument that the Act here does not contain an unstated exception, an exception that Congress has created not only for the ADA, which is the express model of this Act, but in a host of other statutes where Congress carved out specific exceptions for proprietary action. Sotomayor, except in Boston Harbor we said that there was a presumption in favor of it unless Congress explicitly indicated to the country. Well, Boston Harbor spoke to express or implied indication of congressional intent. Here, there is express indication of congressional intent, which is an express preemption provision dictating the scope of preemption. In Boston Harbor, Boston Harbor was implied preemption, right? That's correct, Your Honor, it was implied preemption. There was no express preemption clause to construe, and that language is in the context of an implied preemption case. Here, as Justice Scalia notes, we have an express preemption clause, and we have a clause that has carve-outs for a lot of things, but it does not have a carve-out for proprietary action. And that is the best evidence as Congress's intent. As this Court has stated, when there is an express preemption clause, the plain language of the clause defines the scope of Congress's intent. And here, the plain meaning of the clause covers actions, as here, that are backed by criminal penalties and impose conditions of access to a key channel of interstate commerce. That is the very definition of force and effect of law. The Court is invoking the full coercive power of the State to impose conditions on motor carriers. And that is exactly what Congress sought to prevent. Congress sought to prevent State actions that impede the free flow of trade or that would result in a patchwork of requirements from jurisdiction to jurisdiction. That is what the Court is doing here. It conflicts with Congress's objectives, and it falls within the text of the statute. And they cannot be saved by virtue of a market participant exception that, by Respondent's own admission, is untethered from the text of the statute itself, for the reasons that we've discussed. Congress made quite clear what it wanted to accept from the broad scope of preemption, and this Court has reinforced the breadth of preemption, and it did not include the breadth of preemption. Sotomayor, do we need to get into the market exception if we find that this is as the force or effect of law rather than being a private contract? No. If this has the force and effect of law. It's one or the other. Or both, but we could choose. It either has the force and effect of law or it doesn't. If it has the force and effect of law, it falls within the scope of the express preemption clause, and this Court does not need to address any of that. I'd like to turn to my mic. Some of the rules are okay, though, as you acknowledge, and I guess there's a second question in the case. There is, thank you. You were about to get into that anyway. I was going to, but thank you, Your Honor. I was going to get to the second question in the case, which is this Court's decision in Castle v. Hayes Freight Lines. In Castle, this Court held that a State cannot enforce otherwise valid requirements through a partial suspension of a motor carrier's federally granted right to operate in interstate commerce. That is precisely the authority the Port is claiming here. The Port is claiming the authority to suspend or revoke motor carrier's access to the Port of Los Angeles, the largest container port in the United States and a key channel of interstate commerce. That would affect the Port. Do you agree with that view, whether it's a key component of commerce or not, if it's a particular highway, particular street? Do you think Castle doesn't apply in that case? Your Honor, Mr. Chief Justice, Castle spoke to partial suspensions of a motor carrier's right to operate in interstate commerce, and I think it cannot be denied that in this case, because of the nature of the Port, it is, it would affect a partial suspension. I don't think this Court needs to get into single roads, and I don't think there's any reason to. Well, I think you have to get into it, since I asked you a question about it. You're quite right, Mr. Chief Justice. I don't see any reason to let that camel's nose under the tent. If it's a partial suspension of interstate commerce, it doesn't matter whether it's key or not, does it? That's quite correct. It would affect the partial suspension of interstate commerce, it would seriously disrupt their interstate commerce operations. This falls within Castle's exact terms. And Congress has not said that Castle doesn't apply in that case, because of the nature of the Port, it is, it would affect a partial suspension of interstate commerce, and I think there's no reason to get into it, since I asked you a question about that. The Court's rule is that if you do that three times, and I warned you, the fourth time you can't use this road. That is preempted. There is another road not too far away. You've got to use that one. That is preempted under Castle. The conventional forms of punishment might include the three times and we find an individual truck, but that's what the situation was in Castle. So you can't punish a violation of an otherwise valid regulation through a partial suspension of interstate commerce, and I think that would qualify. And Castle is Kagan We want to keep unsafe trucks off the road, but we're not prohibiting you for past violations that you've cured. All we're doing is keeping unsafe trucks out of our port. Justice Kagan, the conventional forms of punishment include, as we acknowledge, taking an unsafe truck out of service or denying access. If the truck is leaking hazardous material, the port can deny access to that particular truck. The key problem here is the carrier-level suspension of access. And so saying, because that one truck for the carrier might be leaking hazardous material, we're not going to let any trucks, even perfectly safe trucks that don't present any clear and present safety risk, into the port until you fix that unsafe truck. And that's the authority reserved by the State in this case, and that is what Castle said is preempted. And so we are not denying the authority to invoke what Castle called conventional forms of punishment, which we concede includes the type of punishment Your Honor is contemplating. But what it doesn't allow is a suspension of access to a motor carrier as a business entity. Kagan But why is that? Why does it have to be truck by truck rather than operator by operator? Why can't the port say, you know, when we found a couple of trucks that this company uses that are unsafe, we're just going to keep the company off our premises until the company can show us that they've cured all their trucks, that they are a safe operator now? Because that's what Castle dealt with, Your Honor. And I was going to turn to the statutory scheme in Castle, which is Castle's decision was predicated on a statutory scheme that gave the Federal government exclusive authority to grant interstate commerce permits. Scalia Does the Federal government inspect trucks for safety and leaking hazardous materials and such? I don't know that it inspects it directly, and it has provisions for States to do that. But the Federal government still, under 49 U.S.C. 13905, has exclusive authority to revoke a Federal – a motor carrier's Federally granted operating authority. And so there are significant rights that States have to impose. Breyer Has it ever done that? Scalia I don't know if it's ever done that. But what it has done is what Castle said, which is, is there was no reason to deny that the conventional forms of punishment are sufficient to protect the State's safety concerns. And then if they're not sufficient, there was then, and there still exists, a remedy, which is to go to the Department of Transportation and ask them. And that remedy exists to this day under 49 U.S.C. 13905. The same statutory scheme that was present in Castle and animated this Court's decision in Castle is present today. So if they have a safety concern, there are ways to deal with it. They could do what Justin Kagan suggested, which is to deny access to a particular truck. They could go to the Department of Transportation and ask for some type of exemption. But what they can't do is assert the veto power that this Court held was precluded in Castle and in the City of Chicago cases. And that is precisely the veto power that they're asserting here. Breyer If you don't, if you can make a somewhat. This is how I'm seeing the case, and there's some mystery in it to me, and it would affect how I might write this thing or consider it. Look, what they want to do is to not have the trucks park in the neighborhood on the street, and they want to put a tag on it. All right. So the second, you seem to have said what they should have done. You go to the NTSB and you ask. And they do it. They approve it or they don't. And their problem is that they don't want 40 or 50 States each saying a different sticker, all right? So then the whole back fills up with stickers, and that's the problem. That's the problem. You go explain, et cetera. Okay. But the first part, the parking, it seemed to me, of course they should be able to do that. And there seems to me to be a tailor-made exception, the authority of a State to impose highway route controls or limitations. And if that isn't tailor-made for this, I don't know what is. I mean, I don't know what it's doing there. I mean, this — and so why has nobody done that?  Every route restriction affects fares and services. You know? So here I see an exception which seems tailor-made for what they want to do. I see all kinds of problems with the proprietary thing. What am I supposed to do? What I see as the exception tailor-made for this isn't in the case. So what do you suggest? And it's a question for both sides. You're right that it's not in the case, Your Honor. It's not in the case because the only issue here was whether it has the force and effect of law, because that's what the court below held. The court below held that these could escape preemption because the Port was acting arguably in part by a motivation for community goodwill. Scalia. But you agree with that, that that provision would apply? I don't see that it applies. I don't know if it applies. That was going to be the second answer. It's a route restriction. I don't think this is a route restriction. I don't know if it would qualify, and that would be. I mean, you can't say don't drive our truck through the neighborhood? This is residential area. No trucks over such-and-such. And if you can say that, why can't you say do it part of the time? Why can't you say we're arguing a different question? I agree it isn't the same. Not only are we arguing a different question, I think that gets to, and I would like to answer this question and then reserve my time for rebuttal if I might, but that gets to the related to question. Is this, in fact, related to rates, routes and services with respect to the transportation of property? That sometimes is a more factual inquiry, but that is not an issue here. The only issue here is whether it could escape preemption because the Port was arguably motivated in part by a proprietary concern such as community goodwill. None of those words are in the statute, which preempts all actions that have the force and effect of law, and they're preempted on this basis. And I'd like to reserve my time. Roberts. Thank you, counsel. Mr. Bash, welcome. Thank you, Mr. Chief Justice. And may it please the Court. Do you think the city could pass a regulation like Justice Breyer suggested that says stay off residential streets? Well, if the city were to pass that regulation, they'd have to make out a record that it either comes within one of the exceptions. Now, it could have been the safety exception. The Port argued for that here, and the district court rejected it on the record after hearing testimony about the alleged safety and hazardous cargo justifications. They didn't make an argument under sizes and weights. Presumably, they could make that record. You'd have to see about the strength of their justifications. I'd note that I — it would probably be the case they would have to apply uniformly to trucks of a given size or weight. Here, they were only going after dreyage trucks, which are a particular category of trucks. I don't know if they could make that showing with respect to all trucks or if that was their intent here. I'd like to turn, if I could, to Justice Ginsburg's question about the criminal penalties in this case. We accept the Port's statement in their brief at face value that the criminal penalties would only fall on the marine terminal operators. But like Petitioner, we don't think that makes a difference. If, for example, the State Highway Commission said, okay, certain trucks can't use our roads unless you sign a certain agreement, but don't worry, if you don't agree to abide by that agreement, we won't do anything to you, but we'll throw every person who does business with you in jail. Whatever else you could say about that scheme, I think it would be pretty clear that it would be the act of a sovereign, and so would have the force and effect of law within the meaning of this statute. Kagan, Mr. Bash, what would you think of this case if the criminal penalties were taken out of it? In other words, if the Port did this all through contract, basically said to each terminal operator, look, if you contract with truckers that don't have this concession agreement, we're going to charge you a higher price. So if the criminal penalties were not in the case, is there enough here to still make this the force and effect of law? Yes, we think not only is there enough here, but there's another sort of bright line rationale before you get into the gold Boston Harbor sort of understanding of if this is regulatory or market participant. And that's the second factor we cite in our brief, which is we don't consider the Port the equivalent of the cement factory in Reeves, like a commercial enterprise that you might see in the private marketplace. This Port authority, like I think virtually all other Port authorities in charge of these massive container ports, hold land, much like a highway commission, in trust for the public. This is not private property ownership. If you look at all the different metrics of success the court of appeals pointed to and the district court pointed to, and I think the Port points to in their brief, they're not bottom line business metrics like shareholder value and dividends and so forth. It's economic vitality of the region. It's the number of jobs it brought to the L.A. area. That is not the mark of a commercial enterprise. It's the mark of a regulatory body. It's something a mayoral candidate might point to. Roberts. Roberts. Roberts. If a commercial enterprise might want to attract customers because of its reputation as a green company, because of its reputation as hiring local workers, I think you have too confined a notion of what's good business. I think it's true that Walmart might say, hey, we don't do business with labor law violators or we adhere to certain environmental practices as part of a marketing campaign. But I think what this Court said in Boston Harbor was that, yes, a private business could boycott labor law violators, too, and in a sense, the private business would be engaged in, quote, unquote, regulation. But when the government does that, when the government uses its special place in society and its enormous economic power to effectively leverage its power to impose regulation, that's fundamentally different. And that is not the government acting in a market capacity, even though, sure, Walmart or Starbucks could do a similar thing. Kennedy, it's a part of your argument that the city contracts with the port and then the port contracts with the truckers, but at that point, the ports are confined in what they can do. There can be really no bargaining between the ports and the truckers based on what the city has already told the port. Justice Kennedy, that's like our third-order argument. I mean, our first-order argument is criminal penalties and just the nature of a port. And the port doesn't contract with the city. The port is a department of the city. And its members are appointed by the mayor and its revisions to the tariff are codified in city ordinances. So it's in every way a part of the city. It's not just a contractual relationship. We think just the criminal penalties here and the nature of what a port is, a port of a regulatory body that governs a critical part of public infrastructure is enough to resolve this case. If you think, no, the criminal penalties don't matter and this port is more like the cement factory in Reeves, it's really just a plain vanilla commercial enterprise, we do think the fact that it's leveraging significant economic power, that it's the market participant analysis. Ginsburg. Mr. Bash, how then do you deal with the problem that precipitated all of this? Here is a port, it's getting lots of complaints from the neighborhood people. It wants to expand the port. It's being thwarted by environmental suits, so it wants to go green and it wants to do something about the pollution and the traffic and the hazards from the truck. You're saying it can't do that. We're not saying it has no recourse. And I just note parenthetically that the same could be true of any State highway commission that's contemplating an expansion of a highway project. They could face similar suits based on environmental complaints. They could face similar community opposition. We don't want these huge trucks coming through our neighborhood. That doesn't make the decrees and acts of a highway commission, particularly if backed by criminal penalties, acts that lack enforcement. And how could a port respond to the complaints? You're making this neighborhood around the port an environmental hazard. And so we're going to make sure that our representatives vote against any expansion of the port. To deal with that sort of effectively political opposition, community opposition, I think the port retains a lot of flexibility under the statute to address them. If you look at page 90 through 93 of the PEDAP, it discusses the extensive incentive programs that the port established. 35 percent of the drayage trucks currently serving the port, or at least at the time the district court's opinion was written, are new, clean trucks that don't have the same emissions problem. Breyer, but why isn't the — I mean, I thought that the purpose of these exceptions is, of course cities can have parking regulations, of course States and cities can have regulations involving trucks as to how and where they use the highways and which ones they can't use and which routes, et cetera. That's the purpose of that exception, isn't it? I mean, I thought that's what it was. And of course you're quite right in saying they should have to do it uniformly. It says based on size and weight. Okay, fine. What's the problem with that that I'm not seeing? I took Justice Ginsburg's question to be addressing a slightly different point. The exceptions are for things like safety, hazardous cargo. Breyer, it says the authority of a State to impose highway route controls or limitations based on the size and weight of the motor vehicle or the — or hazardous nature. Size and weight, hazardous nature. I mean, isn't there room in those words to include environmental consideration? There may be. It's obviously an issue that hasn't been briefed in this case. I don't think there is. Do you think there is? I would say since it hasn't been briefed, I myself don't know. Since to me, the answer is no. But I just wanted to emphasize for Justice Ginsburg, though, that there are a lot of things that courts and other municipal entities can do to address environmental concerns, and they've been done in this case. It is the replacement of these trucks, which was done through a subsidy and incentive program that's remarkably similar to the one this Court blessed as market participation in Hughes that allowed these extensive emission reductions that the Court's seen. That sort of direct participation in the market has all the hallmarks of what we don't have here. It's not enforced through criminal penalties. It's not the Port acting as a regulator of this public infrastructure. It's actually entering the dreyage market and purchasing trucks, effectively becoming a part owner of the truck. So I do think that the Port has extensive authority to address environmental concerns within the confines of this preemption statute. The Chief Justice asked about the Castle question, whether it matters, oh, what if you just did one road, or what's the size of it? I will say that the Court in Castle seemed to think it made a difference, the sort of size of the imposition, but I don't think it needs to make a difference anymore because we have a direct preemption statute. We think that the logic of Castle applies not only in the context of the licensing scheme that has changed but was effectively in place during Castle, but under Section 14501c itself. 14501c says States can't pass regulations that relate to prices, routes, and services, but it also gives States safety exceptions and so forth. And there needs to be a reconciliation of those two provisions. I think we'd all agree that if a State or if a truck committed two safety infractions, you couldn't say, well, now we're going to regulate your prices, routes, and services as punishment for that infraction. The framework we've set forth in the Castle portion of our brief I think is a reasonable reconciliation. Sotomayor, do you think that a statute that says, if you're a trucking company and you have three violations of X safety regulations, you just can't use our highways because we don't trust you, is that okay? No, that is certainly not okay. We think that fails under both the holding of Castle and just under the current preemption provision, which is maybe the easier way to do it. Why? Sotomayor, why isn't it a standard bat that States and cities use to stop people from repetitive violations to tell them, if you keep doing this and don't remedy what you've done, we're just not going to let you do X, Y, and Z? Why wouldn't the safety violate? We should be clear at the outset that we're not talking about people. We're talking about motor carriers as an ongoing enterprise. So we're not saying an individual can't have their license revoked. If I could finish the question. Finish your answer. But more broadly, we think the Federal regulatory scheme in combination with this preemption provision just bars States from taking certain actions that would affect the interstate operations of motor carriers. Thank you. Thank you, counsel. Mr. Rosenthal. Thank you, Mr. Chief Justice, and may it please the Court. At issue today are two provisions contained in a contract between commercial actors. They set forth conditions under which dredge trucks can enter the non-public portions of the port, and they are indistinguishable, indistinguishable from contract provisions that private parties routinely impose on those who seek to enter their property. In our view, the F4A does not deal with contracts, and it doesn't deal with the right of landowners to condition those seeking entry into their port. What exception do you appeal to? There are a number of exceptions there. What exception are you appealing to from the preemption provision? Your Honor, my first exception is the actual force and effect of law. We do not believe. Oh, well, that's a different point, but you're talking about, you know, an exception for private contract operations as opposed to public matters. There are exceptions to the preemption, and that is not one of them. And other statutes do have exceptions for commercial operations or private operations. This one doesn't. With due respect, the statute says law, regulation, or provision having the force and effect of law. That's a group that's something which applies to the general public. We submit that what we are calling the market participant exception, what it is generally congruent with what is meant by Congress, by the term force and effect of law. The Fifth Circuit in Cardinal said that the market participant analysis should inform what is meant by force and effect of law. We're not. Do market participants impose civil and criminal penalties? Ah. I think the answer is no, but I think the criminal penalties is a red herring in this case, and if you'll just indulge me a moment. The concession agreement everyone concedes does not include any criminal penalties. The tariff which applies to the marine terminal operators, yes, it contains a criminal penalty, but the criminal penalty is not included in this tariff against the marine terminal operators. It's intended for other purposes. We have no recollection of a cargo operation ever having had a criminal penalty. Yes, it's in there. There's a misdemeanor penalty, but it applies to people like trespassers, people who perform traditional criminal acts. There is evidence in the record. I asked the director, the deputy director of the port, how do you enforce these requirements, and his answer was, primarily through our lease contract. Obviously, we don't want to do away with the — with our lessor, but there is no indication and there is no fact on the record that these criminal penalties, which our opponents keep dredging up, are ever used against MTOs. Scalia Is that how we decide these things, when there is on the books a criminal penalty that can apply to everybody? Do we let the State come and say, oh, you know, no harm, no foul, because it's on the books, but we don't really use it? Well, I don't know that we do that. If it's there, it's a criminal penalty. And if the condition of your being able to impose these limitations is that you do not have criminal penalties, there is a criminal penalty. Mr. Scalia, first of all, the direct criminal penalty doesn't apply to the truckers at all. Okay. And so the argument is this is an indirect effect, and what I'm trying to argue is the indirect effect is not criminal in nature. Yes, there is a criminal provision, but I'm saying as a practical matter, criminal penalties aren't used indirectly to enforce this prohibition. Well, but like a lot of criminal penalties, that's the whole point. They keep people from doing crimes. You don't have to be very probative to say we've never had to throw anybody in jail or we've never had to prosecute anybody criminally. But they have a coercive effect that a private operator cannot avail itself of. But, Mr. Chief Justice, what usually criminal penalties apply to the public, the reason I'm bringing this up is we have an entirely separate and much more robust relationship with our own tenants through the lease. The lease is the way this is enforced. Criminal penalty, criminal penalty, no MTO thinks for a second about the criminal penalty. They think about our — the contractual relationship. And that's an important point here, because what we're talking about and what's central here is the management of land which we own, which we will not, underscore, not be able to grow and develop unless we have some modicum of control. And we're not talking about expansive control here, some modicum of control over who enters our land. Let me make one additional point, which I think is terribly important. The owner of land, the owner of land has to have some control of the type which ATA and the government says we can't have control over. I'll give you a simple example. Where we cut a hole in our fence and say the trucks can come in, you can come in on Navy Way, but you can't come in on Prospect Street, that, under a strict definition of the statute, would be prohibited to us. But you can't prohibit a landowner from saying you've got to identify yourself. Breyer, that's why the root regulation thing is the exception. But the State of California decides. I know you're not. The State of California decides, here's what we have, a State Public Utilities Commission which issues a tariff. And what the tariff says is anyone who contracts with a person in this State, a property owner, to move his goods and services cannot charge less than $30 a pound. All right? Plainly preempted. And your case differs because? My case differs because we're not dealing directly with rates, routes, or services. We're not regulating. We are. Breyer, you're saying it falls outside the definition of routes. Well, that argument isn't in front of us. I mean, I thought we were conceding here it falls within the definition of routes or rates or services. No. The parking regulation. That question was. Well, if it doesn't fall within the rate definition, then I'm not sure what we're talking about, because I thought the problem was that it does fall within the rates,  And then the question is, is there a proprietary exception, et cetera. Well, we the answer, our position is that even if it is rates, routes, and services, that what we are doing is not regulation, that this is proprietary. That's why I asked you, and how does it differ from the hypothetical I just put? I think it differs from that because we're not prescribing. If we are prescribing it, it's inherent within our ability to access our particular land. You're saying that you can do by contract what you cannot do by regulation, and I don't understand that argument when there are criminal penalties that attach to the breach of the contract. But, Justice Kennedy, let me say again, there are no criminal penalties that attach to the breach of the contract. It is purely a contract. The remedies are purely civil. Even our other side in their argument has conceded there are no criminal penalties to the breach of the concession. I'm not sure that's crucial. I mean, you think a State can say nobody's going to come on our highways until it signs a contract, okay? These highways belong to us. They're State land. And anybody who wants to ride on the highways, you have to enter a contract with the State. And that's going to get around this Federal statute? No. No. No. Justice Scalia, there's a critical distinction here. The roads, the bridges, the parks are open generally to the public. There is a difference between that and the private part of the city hall. For example, we restrict who comes into the garage under the city hall. We restrict who comes in. It's a highway only for trucks. It's a truck highway, okay? It's specially reinforced and everything. But you have to enter a contract with the State in order to drive your truck on this highway. And that's okay. But we're not dealing with that hypothetical. We don't. I know we're not. That's why it's a hypothetical. But there's a difference. And let me give you the difference, Justice. Scalia. And that is, in this particular case, we're dealing with a business, a commercial enterprise. And I think the appropriate standard which we would contend controls whether force and effect of law, market participant applies, is whether this was an action taken, reasonably taken, to deal with a genuine commercial interest of the port. The restriction on the roadway. Okay. The State makes money on this truck highway. It's a moneymaker. Okay? And that makes it okay. No. We're not prepared to concede that making money is sufficient, taxes are sufficient. We have findings in the district court here that this was undertaken to advance a commercial objective, that commercial objective being to allow the port to grow. The City undertakes regulatory activities. It runs a police department. It runs a fire department, public works. It does, in the case of the City of Los Angeles, run three enterprises, a port, an airport, and a power and water department. That's substantively different than running the public roads and the bridges. And we believe what's critical to this analysis, and what we have extensive findings from the district court, is that this was run as a business. And there were a number of cases, like the cement plant, like the Boston Harbor. Boston Harbor I think I would posit is a far closer case, it seems to me, than what we're dealing with here, which are marine terminals. But nonetheless, in Boston Harbor, this Court held that the regulation of who could work in Boston Harbor, the circumstances fell within the market participant doctrine. Scalia, it was implied preemption in Boston Harbor. Here you have an express preemption clause, which contains exceptions, and among those exceptions is not the running of a commercial enterprise, even though that is made an exception in a number of other Federal statutes, Federal preemption statutes. That's a very high hill for you to climb, relying solely on the fact that you're a commercial enterprise. It's not the only thing, Justice Scalia, I'm relying on. I'm also relying on the language which Congress put in, which are words of limitation, which is force and effect of law. If Congress had not — had said any requirement by the Port, any requirement by a city whatsoever, I believe we'd have a closer case. But they're only talking about things which have application to the general public. We submit that force and effect of law almost invites a market participant analysis. Let me also respond to your point about the ADA, the Airport Deregulation Act. The reason there is a limited exception for airport proprietors, as this Court has held, is because there was a longstanding issue about airports being able to impose restrictions about noise pollution on surrounding communities. Congress was well aware back in the 1970s when this statute was enacted of that controversy, and they wanted to preserve the existing rights of airports. There is no comparable controversy with respect to truck ports or ports or the government that was ongoing in 1994 when this particular statute was adopted. But let me point out that what did occur in 1994 was that Congress was writing against the backdrop of this Court's decision in the Boston Harbor case, in which Congress was told that in the absence of something expressed which says that a city or state can't manage its own property when it pursues its proprietary interests, that there would not be inferred, not be inferred a restriction on a state's power to manage its own property. So unlike the situation when the ADA was adopted, when the F4A was adopted in 1994, there was, we submit, a background principle which this Court had enunciated earlier, that there was a presumption that our proprietary powers were to be preserved. If I can, I'd like to go on to the Castle argument as well. Our point, we make three different points in Castle. First of all, our position is that the Castle decision was predicated upon a very specific statutory regime that existed in, under the Federal Motor Carrier Act of 1935. Justice Black specifically noted the details of that statutory regime, which included certificates of convenience and necessity, very precise rules under which trucks were to operate within the United States. That regime has died, died several decades ago, and we would submit that the Castle doctrine, as it existed, died with that regime. Kagan. Kagan. Ms. Rosenthal, could I interrupt you for a second and just make sure I understand what your policy is? Who do you exclude from the Port? What trucks, what trucks or what trucking companies do you exclude? Well, in fact, we don't exclude anybody from the Port. We simply ask that those trucks that come on to Port property sign a non-exclusive concession agreement which agrees to certain conditions. So, drayage trucks that come on on a regular basis have to sign these conditions. We would point out that people who operate at our Port intermittently can get day passes. And generally speaking, What if they violate those conditions? I mean, that's where the shoe pinches. What if they violate those contractual conditions? Then do you exclude only the truck that violates it or do you exclude the whole trucking company? Well, we, we, there's a gradation of remedies. We don't, we have, we have generally not excluded or revoked. Generally, what we've done is tried to get compliance. There are penalties, there are mechanisms of a contractual nature which are used. Those are the particular What's the ultimate? What's the ultimate? You've tried everything else and you whack them with the big penalty. What is that? In cases involving fraud, criminal penalties of a continuing nature, we can suspend or revoke their right to come on to the property. That's the ultimate, but, but, and this deals with the Castle argument. And not just the noncompliant trucks, but the entire operator for having some noncompliant trucks, is that correct? Again, we, this, there hasn't been this experience of, of having to revoke and, and suspend in cases like what you're describing. There are, for example, there has been revocations when LMC has not had the insurance it's required. But that applies to all of their trucks. Well, if you're saying there isn't that experience, I mean, could, are you in a position actually to represent that you would not exclude anything except noncompliant trucks? There, there hasn't been the experience. What we said before is that the severest penalties are intended for severe continuing offenses. And our position is that given the fact that there are reasonable applications of the revocation, of the suspension requirement, given the fact that ATA has launched a facial attack on our regulation, that it will be sufficient time to deal with an unsupplied, if Castle survives. And this Court has three reasons, and the first one, I, I'm not sure why it wouldn't survive in a policy of deregulation. It would seem to apply a fortiori or equally, but I don't want to argue that with you. I want to be sure I have the second and third. Yeah. Let me, let me give you, let me give you my, the three. First, we don't believe Castle continues. What's the second and third? The second argument, second argument is that even under the Castle regime, all Castle talked about is going, allowing a truck to go up to a customer's property line, that, that a certificate of convenience and necessity never gave anyone permission to go into Wal-Mart or anything else. And that's what we're talking about here. And thirdly, our position is that given this is, this being a facial attack, given the fact that we believe that there are lawful applications of, of the revocation to ongoing, continuing violations, which is, frankly, the only, I can't make a representation. Scalia. I've never heard of this, Dr. Scalia. This is a facial attack to a contract? Is that it? Well, but it's, it's a, it's a facial attack to, it is, it's a facial attack to a contract. We don't believe that it applies to our contract at all. We have to attack this contract provision by, or application by application? But, but they're arguing that our contract is tantamount to a law. Right. And I've heard of facial attacks to criminal statutes. Right. And, but, but they are attacking this remedy to, they've, they've talking, they are attacking this on, on its face and saying that no application of this provision is, is an acceptable. What's the one that would be? Give me the example that you're thinking of where, given Castle and its application, it would be acceptable. Where, where, where a truck is in continuing violation, a company is in continuing violation of a safety restriction. All right. Now, how does it, how, how would that differ from Castle? Because what Castle was concerned about was a State that has a perfectly lawful regulation and it's violated. Then the State, as the remedy, excludes the truck from the State. That's what it's concerned about. And it didn't say anything about accepting very serious violations, i.e., continuing ones. The reason was the need for interstate regulation of an interstate enterprise. And that was the reasoning. Leave it to the ICC. A for sure, where it's deregulatory policy, but leave that to the side. I want to know, your best case seemed that one, and I don't see the example yet. Let me try to respond, Justice Breyer. I think the, if one reads the opinion in Castle, Castle dealt with a past violation, not a continuing violation. The record in that case didn't deal with the, and I think the words of the State, Justice Black, said that would be a different case, that there would be a right to exclude a continuing violation. Sotomayor, could I just go back, because the theoretical questions, the agreement requires the operators to have off-site parking. Yes.  It has to do that for a reason. It means that if its trucks don't use that off-site parking, that the operator is in default? Is that the city's position? If it does, it submits an off-street parking plan for all of the trucks which are registered to go onto the property, and it has to agree to keep those trucks in the off-site parking. If it breaches that agreement, it's treated as a breach, and we. Sotomayor, I just wanted to make sure. What you're saying is if trucks park anywhere else, then the operator is in violation of the agreement? That's correct. All right. With respect to the placard, as I read the provision, it says you have to have the placard coming in and going out. Is this like one of those parking placards that people can affix temporarily? Or does it have to be a permanent? No. It does not have to be permanently affixed to the truck. Well, how does that help you? Meaning to, to, to? Well, there are the we provide them, if they want, a sticker they can put on their truck, but we don't require it. We just give them the words, and most trucks, in fact, virtually all trucks of this type have a, have a frame on the outside where they temporarily put plaques. For example, times when they're carrying hazardous materials, you've probably seen that color design on the side. Those are temporarily affixed. So if a trucking company or an LMC wished to just put the plaque on as it's crossing the gate and take it off when it's leaving the gate, it's, it's fully lawful to do that under our restrictions. Most of them just leave, leave it on, but that's not required. The plaque is only required as it enters, while it's on port property, and when it leaves. So as it leaves. So how is the public going to use that plaque? What? How is the public going to use that? The public hangs around the port as it's loading to call in complaints? There, there are, there are, there are, members of the public include also the people who are at the MTO, also other truckers. The purpose of it is essentially to provide a, a remedy to notify from people who are on the port, and, and also to act essentially as a notice to the drivers in the trucking company that if they're violating the rules, their people know there's a phone number they can call, so it acts, it has a certain enforcement effect. I must point out that it's. Ginsburg. Would you clarify, would you clarify the, what happens when there is an infraction, say, three trucks? Is it right that you can suspend until the infraction is cured, that you can suspend all of that operator's trucks? We, we, we are, there's been very little practice, Justice Ginsburg, under that. But basically, our enforcement where there have been violations has been to ban the particular trucking question, not the entire element. But you could do the other. And what, what are the, is, is it just a matter of grace that you will say, we'll require them to fix those two trucks and all the others can travel? Or could you say, until you fix those two trucks, none of your trucks come through? We, we have built in a gradation. I mean, it's not purely a matter of grace. We classify things as minor violations or major violations. Let's say it's a major violation. If it were a major violation involving something we believe was systemic within the LMC, the, not the regular, the concession agreement would leave the possibility that we could revoke or suspend until the problem was corrected. But, but. And how about after it's corrected? And the, the government says some uncertainty about that. Whether you. We have, we have never enforced it that way. I mean, the enforcement, we haven't used revocation. We haven't used suspension. And generally speaking, our intent has been, as we stated in the lower court and as we stated repeatedly, to use this for continuing violations. But we're really talking about future actions because revocation and suspension have not been common. Let me conclude by making two points here. Number one, this port undertook these actions as a reasonable and genuine response to the needs to build and grow a port. If we are prohibited from taking what are substantively limited actions to control trucking, then essentially we're going to be in a posture in which this port will be disabled by its surrounding community from doing what it needs to do to compete. Secondly, we submit, you cannot be the owner, proprietor of property, without having some control over the conditions under which owner, under which invitees, business invitees come onto your property, that this statute of Congress was not intended to constrain that property. Make this argument precisely and substitute for port authority the words city of San Diego. Okay? And you'd be still right. I mean, what's bothering me is, I don't know, you got the right one. So if we decide in your way what we've done is distinguish precisely the same situation, you from the city of Los Angeles, simply because of the method they have of governmentally regulating the port. I disagree, Justice Breyer. It's not because we have the port as a proprietorship. It's because these actions were commercial in nature. The port is operating as an enterprise, not because it has the label enterprise, but because this is a business. And as a business, we should be entitled under even-handedness to do what a Wal-Mart or any other company could do to enable us to prosper, grow and nurture our business enterprise. Thank you. Roberts. Thank you, counsel. Mr. Lerman, you have 4 minutes. Justice Scalia, the criminal penalties are not a red herring. Roe makes clear that you can't circumvent the Act by the law. I didn't say there were red herrings. I know you didn't, Your Honor. I was referring to Mr. Rosenfeld's argument that in response to a question of yours. You did not say there were any kind of herring, and there are not. Justice Breyer, in response to your question, rates, routes and services are not at issue in this case. The only issue is whether they have force and effect of law. That's the only issue before this Court. The Court below said that they lack they fell outside the scope of the statute because of the proprietary nature. Mr. Rosenthal talked a lot about the commercial motivations, but the statute doesn't speak to commercial motivations. The statute speaks to actions with the force and effect of law. These have the force and effect of law and are preempted on that ground. Mr. Rosenthal said Castle has died. Castle is still alive. The statutory scheme that formed the basis of this Court's decision in Castle remains to this day in Title 49 of the U.S. Code. And that was the basis for the decision then, and it's the basis today. Justice Ginsburg, the concession agreements gives the Court unfettered discretion to determine whether or not to suspend or revoke access. In this Court's city of Chicago cases, the fact that the city claimed at least some power to deny a license or access to interstate commerce was sufficient, and it's sufficient in this case. Thank you. But I thought there was a representation made that they tow the line that the government draws, that is, they can say no access as long as you have trucks in your fleet that don't comply. But once you've gotten your fleet in order and you're in compliance, then we can't punish you for having wronged in the past by saying you're suspended. That's the position that the government is taking, and I take it you don't agree with that. I don't agree, and I think counsel said right here that they reserve the authority to suspend access for past or ongoing violations, and that runs afoul of Castle under its plain terms. Are there no further questions? Thank you, counsel. The case is submitted.